UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JULIA MCCREADY, | : | Case No. 3:13-cv-128 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| DAYTON POWER & LIGHT COMPANY LONG-TERM DISABILTY PLAN, *et al.*, | : | |
| Defendants. | : | |

**DECISION AND ENTRY GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR ERISA DISCOVERY (Doc. 11)**

This case is before the Court on Plaintiff Julia McCready's Motion for ERISA Discovery. (Doc. 11). Defendants filed a Brief in Opposition. (Doc. 14). Plaintiff's Motion is now ripe for decision.

**I. FACTS**

Plaintiff Julia McCready ("Plaintiff") worked for the Dayton Power and Light Company ("DP&L") as a Network Engineer II from January 2, 2001 to November 12, 2010. As a long-term employee of DP&L, Plaintiff had access to short-term and long-term disability benefits sponsored by DP&L. DP&L administers the benefits through a plan which contains an insurance policy offered by Defendant Unum.

According to Unum, the job title of Network Engineer II requires an understanding of "networking and telecommunication theory and practice[,] … the use

of 20 lbs. of force occasionally, [and] occasional reaching and frequent keyboard usage."

According to Plaintiff, the position performs the following tasks:

> troubleshoots network performance issues and creates and maintains disaster recovery plan.  Recommends upgrades, packages and new applications and equipment.  Under limited supervision configures and maintains routers, switches, and hubs for network systems (including wireless), evaluates and recommends new products, maintains knowledge of emerging technologies for application to the enterprise

Based on the Court's review of the record at this time, it appears that Plaintiff was exposed to certain unidentified chemicals and irritants while her workplace was undergoing renovations and/or construction.  In late 2010, Plaintiff applied for and received short-term disability benefits for a total of ninety (90) days and, on April 29, 2011, Plaintiff applied for long-term disability alleging disability arising from:

> Several exposures to irritants, chemicals, glues, epoxy, etc., resulting in severe anaphylactic allergic reaction causing swelling of throat, difficulty breathing, swelling legs, hands and feet, heart palpitations, difficulty swallowing and skin rash, headache, sore throat, drop in blood pressure, angioedema, chest pain, coughing, sneezing and wheezing, PVC, PSC, low blood oxygen.

Unum continued to pay Plaintiff long-term disability benefits until September 16, 2011, when it denied her claim for long-term disability.

Under the Unum Group Disability Policy at issue, there is a 180 day elimination period requiring continuous disability through that period, which must be satisfied before benefits can be paid.  In this case, this relevant 180 day period commenced November 13, 2010 and ended May 13, 2011.  As noted by Defendants, the following medical

information contained in the Administrative Record was presented to Unum for evaluation:

- On September 22, 2010, Dr. Burton described Plaintiff's narcolepsy and cataplexy as doing well.

- Plaintiff was hospitalized on November 13 until November 19, 2010 for abdominal pain and diarrhea.

- Plaintiff was hospitalized on December 8 and December 9, 2010 for acute respiratory distress and possible anaphylactic reaction.

- On December 28, 2010, Dr. Rubio's notes described the narcolepsy as stable.

- On January 5, 2011, Plaintiff was tested with attempts to induce laryngospasm with inhaled irritants of ammonia, Pledge, Right Guard deodorant and other cleaning agents without reaction.  Oxygen levels dropped only slightly with increased exercise and returned to normal within 30 seconds of sitting.

- On December 23, 2010 and January 19, 2011, Dr. Karabatak finds no indication of cardiac issues, and provides no restrictions or limitations.

- On February 14, 2011, Dr. Burton wrote, "Julia is doing very well.  She likes her new job. Her daytime alertness is good on her Klonopin.  The cataplexy is well controlled on Xyrem and, in short, she is doing very well." Plaintiff was to return in six months.

- On April 11, 2011, Dr. Bernstein completed an attending physician statement and he stated, "Patient can't work in environments where she is exposed to chemicals … irritants or extreme temperatures."

- On May 6, 2011, Plaintiff spoke with a Unum disability representative.

- During the conversation, Plaintiff stated she cannot work in environments where she is exposed to chemicals or irritants.  She advised her symptoms began in August 2008 (sic) [2010] and coincided with workplace renovations. She advised she has narcolepsy but stated it was not disabling. As of that date, Plaintiff advised she could perform household chores such as grocery shop, laundry, and vacuuming.

- On May 10, 2011, Dr. Rubio provided his completed attending physician statement.  Dr. Rubio stated, "Avoid chemicals, fumes, dust and exposure to extreme hot/cold."  In response to the question, "Did you advise the patient to stop working?" Dr. Rubio responded, "No."  When asked what primary diagnosis prevented Plaintiff from working, Dr. Rubio wrote, "None pt able to work."

The 180-day elimination period ended May 13, 2011.

On September 16, 2011, Unum denied Plaintiff's claim for disability.  In doing so, Unum essentially concluded that the restrictions and limitations opined by Plaintiff's treating physicians, *i.e.*, no exposure to irritants or noxious stimuli in the workplace, were medically reasonable; however, such restrictions did not preclude Plaintiff from performing her job in the national economy during the relevant time period.

Plaintiff appealed Unum's denial of her disability benefits claim.  Plaintiff's appeal included new documentation from Dr. Burton and Dr. Bernstein.  In correspondence dated October 11, 2011, Dr. Bernstein advised Plaintiff's attorney that because of Plaintiff's physical symptoms and stress associated with her job, Plaintiff should remain off work until April 7, 2012.  On October 17, 2011, Dr. Burton wrote stating that Plaintiff has "severe narcolepsy with cataplexy with excessive daytime sleepiness that almost certainly precludes her from holding down gainful employment."

On appeal, Unum concluded that during the applicable 180 day elimination period beginning November 13, 2010 and ending May 11, 2011, a lifetime restriction regarding the avoidance of fumes or extreme temperatures was supported by Plaintiff's medical history; a period of no work was supported during the hospitalizations in November and December 2010; no restrictions were supported from a behavioral health perspective; and

4

no restrictions were supported in relation to Plaintiff's narcolepsy and cataplexy. Plaintiff now seeks review in this Court and requests that the Court allow discovery of three physicians who reviewed Plaintiff's claim and offered opinions concerning her alleged disability. Those physicians are Peter Kouros, M.D., Jacqueline Crawford, M.D., and Dr. Alfred Kaplan, M.D.

## II.  STANDARD OF REVIEW

The general rule is that the district court only considers "evidence that was first presented to the administrator" when it made the original decision to deny benefits. *Wilkins v. Baptist Health Care Sys.*, 150 F.3d 609, 618 (6th Cir. 1998). That evidence is designated as the "administrative record." *Kalish v. Liberty Mut.*, 419 F.3d 501, 508 (6th Cir. 2005). Therefore, generally, discovery is not permitted in an ERISA denial-of-benefits case. *Id*. As stated most recently by one district court, "discovery in ERISA cases, where the district court's review is 'based solely upon the administrative record,' is the exception and not the rule." *Neubert v. Life Ins. Co. of N. Am.*, No. 5:13 CV 643, 2013 WL 5595292, *1 (N.D. Ohio Oct. 10, 2013) (citing *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring)).

Nevertheless, courts recognize an exception to this general rule "when evidence outside the record 'is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.'" *Johnson v. Connecticut Gen. Life Ins. Co.*, 324 F. App'x 459, 466 (6th Cir. 2009) (citing *Wilkins*, 150 F.3d at 619 (Gilman, J., concurring)). When this

5

exception applies, "any prehearing discovery at the district court level should be limited to such procedural challenges." *Id.*

An inherent conflict of interest exists where, as in this case, "an insurance company is both the administrator determining eligibility for benefits and the insurer responsible for paying the benefits out of its own pocket." *Id*. at 465. Nevertheless, "discovery will [not] automatically be available any time the defendant is both the administrator and the payor under an ERISA plan." *Id*. at 467. Instead, because the significance of a conflict of interest depends on the circumstances of each case, courts must utilize their discretion and "evaluate and determine whether and to what extent limited discovery is appropriate in furtherance of a colorable procedural challenge[.]" *Id*.

### III. DR. KOUROS

Plaintiff first seeks discovery regarding a potential bias on the part of Dr. Kouros, who Plaintiff argues is a full-time employee of Unum. Plaintiff argues that Dr. Kouros' opinion demonstrates bias because he cast aside all of the opinions of Plaintiff's physicians. A review of Dr. Kouros' report, authored on September 14, 2011, reveals his agreement with the restrictions and limitations provided by Plaintiff's physicians at that time, *i.e.*, that Plaintiff must work in an environment free from chemicals,[1] irritants and extreme temperatures. Dr. Kouros's concluded, however, that such restrictions did not preclude Plaintiff from performing the demands of her position on a full-time basis

---

[1] Dr. Kouros did note that the restriction and limitation was overbroad insofar as it encompassed all chemicals, and that the restriction should more specifically restrict Plaintiff from being exposed to the unidentified irritant causing her respiratory episodes.

because her position did not involve regular exposure to any chemicals, irritants or extreme temperatures.

It is not disputed that Plaintiff had a documented history of narcolepsy and cataplexy at the time Dr. Korous authored his report. However, at the time Dr. Korous conducted his review, Plaintiff's records from Dr. Burton, who treated Plaintiff for these conditions, revealed that Plaintiff's narcolepsy and cataplexy were under control. In fact, on September 22, 2010, *i.e.*, approximately one week *after* Dr. Kouros wrote his report, Dr. Burton himself noted that, at least, "[f]rom a narcolepsy / cataplexy standpoint" Plaintiff was "doing well[.]" (Doc. 10-3, PAGEID 916). Thus, it is not entirely clear from Plaintiff's Motion, or the Court's initial review of the opinions and records cited by the parties, what opinions offered by Dr. Burton, or any other of Plaintiff's doctors, Dr. Kouros "cast aside" on September 14, 2011.

Insofar as Plaintiff suggests that Dr. Kouros "cast aside" the opinions of Dr. Bernstein, Plaintiff's Motion and the record citations simply do not support such an assertion. Most notably, Plaintiff cites a letter from Dr. Bernstein concluding that Plaintiff should remain off work until April 7, 2012, because of her symptoms and the stress associated with her job. However, that letter from Dr. Bernstein is dated October 11, 2011, almost a month after Dr. Kouros' provided his opinion and Unum's denied Plaintiff's disability claim.

In other words, it is not clear to the Court what opinions Dr. Kouros "cast aside" on September 14, 2011. Having failed to evidence that the conclusions of Dr. Kouros

7

were the result of bias, or even that he disagreed materially with any of the opinions held by Plaintiff's physicians *at that time*, the Court denies Plaintiff's requested discovery as it pertains to Dr. Kouros.

### IV.  DR. CRAWFORD

Next, Plaintiff seeks discovery concerning Dr. Crawford, who apparently first authored a report regarding Plaintiff in April 2012.  In that report, Dr. Crawford focused on the reasonableness of Dr. Burton's opinion that Plaintiff's narcolepsy and cataplexy precluded her from employment during the elimination period ending in May 2011.  Dr. Crawford disagreed with Dr. Burton's opinion, finding that the available medical information did not support a conclusion that Plaintiff's autonomic dysfunction and narcolepsy with cataplexy impacted her ability to work during the elimination period ending May 11, 2011.

Soon thereafter, however, Dr. Crawford spoke with Dr. Burton by phone concerning Plaintiff's work restrictions and limitations.  At that time, Dr. Burton opined that, during the relevant elimination period, Plaintiff would have required the ability to come to work late, would have required supervision and would have required the ability to nap at work.  On May 17, 2012, Dr. Crawford concluded that these restrictions and limitations were not supported during the applicable elimination period ending in May 2011, because Plaintiff's medical records, notably records from Dr. Burton in February 2011, stated that her narcolepsy and cataplexy were under control.  In this regard, the Court also notes the aforementioned note from Dr. Burton in September 2011, in which

Dr. Burton stated that Plaintiff's narcolepsy and cataplexy were under control. The Court believes that this mere "difference of professional opinion . . . does not colorably establish bias." *Bennetts v. AT & T Umbrella Plan No. 1*, No. 12–14640, 2013 WL 4042661, *3 (E.D. Mich. Aug. 9, 2013) (citing *Kotowski v. Daimler–Chrysler Corp. Long Term Disability Benefit Plan*, 06–15278, 2007 WL 4171238, at *10 (E.D. Mich. Nov. 20, 2007)).

Plaintiff also cites to an opinion letter written by Dr. Burton and sent to Unum on or about May 21, 2012. In this letter, Dr. Burton stated that the relationship between Plaintiff's cataplexy and her mast cell activation syndrome/ angioedema was finally becoming clear to him. Dr. Burton wrote:

> It is very clear to me the apprehension over the fear of needed to be intubated with her angioedema is enough to further drive her anxiety and thus her cataplexy. There is a unifying theme underlying her symptomatology from both of these conditions (namely anxiety).
>
> With that in mind, I am now in a better position to respond to Dr. Crawford's questions posed to me last week on the phone as to what restrictions I would place on her as the treating physician given these conditions:
>
> 1. I would specifically control her air; I would require that she work in an operation where there is a controlled air environment with respect to irritant inhalants, dust, fumes, and smoke.
>
> 2. That there be no outside sun exposure, as sun does flare her angioedema.
>
> 3. Of course, that there be no stress associated with the work environment, as anxiety associated with this would almost certainly flare up both conditions of her cataplexy and her angioedema.

This letter post-dates any written opinion offered by Dr. Crawford.  In fact, by the time Dr. Burton provided Unum with this opinion, Plaintiff's case was referred to Dr. Kaplan for review.  (Doc. 10-5, PAGEID 1278).  Thus, it is not clear that Dr. Crawford "ignored" the opinion offered by Dr. Burton on or about May 21, 2012, as suggested by Plaintiff.

It appears, however, that Dr. Bernstein, in October 2011, did identify stress as the significant reason why Plaintiff was unable to work at that time.  From what the Court can construe from Dr. Bernstein's correspondence in October 2011, it appears Dr. Bernstein was also concerned that the stress associated with Plaintiff's job had some impact on the symptoms Plaintiff displayed at that time.  Dr. Bernstein specifically noted diagnoses of autonomic dysfunction, narcolepsy and mast cell releasing syndrome.  As noted by Plaintiff, it is not clear from Dr. Crawford report that she ever considered Plaintiff's angioedema or mast cell activation syndrome in assessing Plaintiff's alleged disability.

Certainly, the Court cannot conclude based on the record at this time that Dr. Crawford's failure to mention Plaintiff's angioedema or mast cell activation syndrome in assessing Plaintiff's purported disability actually evidences bias or a conscious decision to ignore portions of Plaintiff's medical background.  However, Plaintiff's procedural challenge in this regard is supported by something more than mere conjecture.  Thus, the Court will permit the limited discovery regarding Dr. Crawford proposed by Plaintiff.[2]

---

[2] The discovery proposed by Plaintiff is attached to Plaintiff's Motion as Exhibit 2.  (Doc. 11-2).

## V.  DR. KAPLAN

Dr. Kaplan's report is dated May 31, 2012; thus it is after Dr. Burton forwarded his newest opinions on or about May 21, 2012.  Dr. Kaplan does not mention this new information from Dr. Burton in reviewing Dr. Crawford's conclusions.  Dr. Kaplan also fails to note consideration of Dr. Bernstein's opinions offered in October 2011.  Similar to Dr. Crawford, Dr. Kaplan also does not reference mast cell activation or angioedema in determining whether Dr. Crawford's opinion is supported by Plaintiff's medical records.  Accordingly, for the same reasons that the Court will permit the limited discovery concerning Dr. Crawford, the Court will also permit limited discovery concerning Dr. Kaplan proposed by Plaintiff.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for ERISA Discovery (Doc. 11) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff may seek the limited discovery proposed by Plaintiff concerning Dr. Crawford and Dr. Kaplan.  (Doc. 11-2).

**IT IS SO ORDERED.**

Date:  11/5/13                                              */s/ Timothy S. Black*
                                                                     Timothy S. Black
                                                                     United States District Judge